UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SONIA LEE NETTLES,<br><br>             Plaintiff,<br><br>     v.<br><br>FARMERS INSURANCE EXCHANGE and<br>FARMERS GROUP, INC.,<br><br>             Defendants. | Case No.  C06-5164RJB<br><br>ORDER ON DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT |

This matter comes before the court on Defendants' Motion for Summary Judgment.  Dkt. 20. The court has considered the pleadings filed in support of and in opposition to the motion and the file herein.  The court has determined that the issues can be reviewed on the record and that oral argument is not necessary.

PROCEDURAL HISTORY AND RELEVANT FACTS

*Employment History.*  Plaintiff Sonia Lee Nettles is a black woman of Jamaican descent who was born on December 11, 1960.  On January 3, 1983, plaintiff was hired by defendant Farmers Group, Inc. (Farmers Group) as a File Clerk.  During the course of her employment with Farmers Group, Ms. Nettles was promoted to several other clerical positions.

ORDER
Page - 1

1    On May 1, 1998, plaintiff became a Claims Processor at the Portland North branch claims

2 office (Portland BCO), one of Farmers Insurance Exchange's branch claims offices in Portland,

3 Oregon.  Defendant contends that, as a claims employee, plaintiff was employed by Farmers

4 Insurance Exchange.  In March of 1999, plaintiff was promoted to Claims Customer Service

5 Clerk.  Her job functions included receptionist duties, such as greeting and talking with customers

6 in the drive-in area; and clerical duties involved in the processing of auto claims, such as

7 contacting the insured, locating the damaged vehicle, and assigning the claim to the adjuster.

8    In 2000, Farmers Insurance Exchange announced that in 2001, it would shut down the

9 Portland BCO.  Ed Mansell, who had been the manager of the Portland BCO, became the

10 manager of the Vancouver, Washington branch claims office (Vancouver BCO) in the Fall of

11 2000.  Carrie White, who had been a clerical employee at the Portland BCO, became the clerical

12 supervisor at the Vancouver BCO in late 2000.  Shortly thereafter, plaintiff applied for an open

13 clerical position at the Vancouver BCO.  Ms. White interviewed the candidates and recommended

14 to Mr. Mansell that they select plaintiff for the position.  At the time plaintiff was selected for the

15 clerical position at the Vancouver BCO, Mr. Mansell and Ms. White knew that she was black and

16 from Jamaica.

17    *Plaintiff's Performance Reviews.*  On November 19, 1998, plaintiff had a performance

18 review, signed by Pam Babcock as her supervisor and Ed Mansell as the next level manager.  Dkt.

19 21-3, at 1.  This performance review noted that plaintiff had "a very good forthright attitude with

20 your co-workers and myself.  This is appreciated, as we are able to communicate well together."

21 *Id*.  The review further noted that plaintiff had "met immediate expectations for your job duties as

22 we discussed in a meeting regarding advancements," and that she would "need to further increase

23 your knowledge in the Drive-In and have less errors in spotting vehicles." *Id.*  In his deposition in

24 this case, however, Mr. Mansell stated that he had concerns about plaintiff getting along with

25 other employees and managing personal problems, including telephone calls. Dkt. 57-2, at 6-7.

26

27

28

ORDER
Page - 2

1    Plaintiff's performance review of October, 1999 (signed by Ms. Babcock and Mr.

2  Mansell); December, 2000 (signed by Ms. Babcock and Mr. Mansell); and December, 2001

3  (signed by Ms. White and Mr. Mansell) assessed her as "meets expectations" in the areas

4  assessed, but none of the evaluations noted concerns about plaintiff getting along with other

5  employees or managing personal problems.  Dkt. 21-3, at 3-15.  In his deposition, Mr. Mansell

6  stated that plaintiff continued to have problems with personal telephone calls and managing

7  personal issues in the workplace.  Dkt. 57-2, at 18.

8    *Plaintiff's Complaint to Supervisors.*  In 2001, plaintiff complained to Ms. White about

9  the behavior of one of her clerical coworkers, Pat Reudink.  Ms. White informed Mr. Mansell of

10  plaintiff's complaint.   Plaintiff stated in her deposition that she told Mr. Mansell and Ms. White

11  about "how she [Ms. Reudink] was treating and that she's treating me different–from the others

12  [sic] employee."  Dkt. 21-2, at 17, pp. 80-81 of plaintiff's deposition.   Plaintiff further testified as

13  follows:

14    Q.  So specifically what did you tell them?  Did you tell them that she yelled at you?

15    A.  Well, I – I tell her the way she talks to me, she embarrass me in front of customers,
    you know.  And, basically, when I talk to – when I have to – when I have to go to her for
16    any work related she – I mean, she basically makes me – I mean, I was – when I have
    to go to Pat to talk to her about anything related to work, I get – I was very nervous because
17    of the way she treated me.  And, you know, it was uncomfortable – it was a very
    uncomfortable situation, trying to work with her and trying to go to her for any reason,
18    you know, for work related issue.

19    Q.  Okay.  Did you say anything to Ed Mansell or Carrie White that you thought it was
    related to your race, Pat Reudink's treatment of you?
20
    A.  Yes.
21
    Q.  You told that – Did you tell that to Ed Mansell?
22
    A.  Yes.
23
    Q.  Did you tell that to Carrie White?
24
    A.  Yes.
25
  Dkt. 21-2, at 17, deposition of plaintiff, at pp. 80-81.  Mr. Mansell stated in his declaration that he
26  was not aware that plaintiff believed that Mr. Reudink's behavior was racially motivated.  Dkt.

27  44, at 4.

28
  ORDER
  Page - 3

1    Mr. Mansell first spoke privately with Ms. Reudink and then jointly with Ms. Reudink,

2  plaintiff, and Ms. White.  During the joint meeting, plaintiff discussed her complaints about Ms.

3  Reudink's behavior.  Ms. Reudink also raised issues during the meeting, expressing frustration

4  that she sometimes had to complete tasks that she felt could have been done by plaintiff.  Mr.

5  Mansell and Ms. White concluded that plaintiff and Ms. Reudink had a personality conflict.  Ms.

6  Mansell encouraged plaintiff and Ms. Reudink to work through their issues so that they could get

7  along at work.

8    Plaintiff stated in her deposition that Ms. Reudink's hostile behavior continued, and that

9  she informally complained to Ms. White a second time, about a year after the first complaint, that

10 Ms. Reudink yelled at her about a work issue. Plaintiff stated that Mr. Mansell learned of the

11 incident and met with plaintiff the next day to discuss how to resolve the ongoing tension between

12 her and Ms. Reudink.  Plaintiff stated as follows:

13    A.  I met with – I can't remember if Carrie was there that day, or whatever; but I know
     that when I came – when Ed Mansell come in, I think it was the Monday or Tuesday
14    morning, he call me into his office and he indicated to me that he heard that I said that
     they disappoint – they let – they let me down.

15
     And I said to him, I say, "Yes. Because ever since I've been here, basically Pat is
16    harassing me and I've been complaining to you" – "to you and Carrie, basically, and
     nothing has been done, and I'm tired of it, and I'm going to go"  – I'm going to go above
17    him and Carrie, to see if I can get this resolved.

18    Q.  And what did Ed say in response?

19    A.  Ed said to me that it's my right to do so if I want to, but I need to think about the
     repercussion that may happen if I went higher up.  And he asked me if I wanted to be
20    transfer from that office, and I said, "No, I don't want to transfer from that office.  I feel
     that Pat should learn" – or – "Pat should learn how to work with me, because I am not a
21    very difficult person to work with.  Whatever it is, I don't know, but," I said, "I think Pat
     should learn to work with me."
22
     And, basically, you know, he said he will – he will talk to Pat and, you know, I think
23    maybe that's when basically he advised Pat that if there if there's any – if she have any
     problem or anything, then she needs to talk to Carrie or him, you know, and then he will
24    relate it or whatever.

25    So that was the – that was the – He basically disencouraged me from going to
     personnel to lodge a complaint.
26
   Dkt. 21-2, at 21-22, plaintiff's deposition at pp. 97-98.
27

28

ORDER

Page - 4

1    Plaintiff stated that she did not go to human resources because she thought that "after I'd

2 spoken to him and he indicate that he will speak to Pat or whatever, and then – you know, I just

3 feel that probably maybe that would help."  Dkt. 21-2, at 23, plaintiff's deposition at p. 102.

4 Plaintiff stated that, after this, Ms. Reudink didn't speak to plaintiff again.  Dkt. 21-2, at 23,

5 plaintiff's deposition at p. 103.

6    *December 2002 Layoff*.  In 2002, Farmers Insurance Exchange, which had been planning

7 a nationwide reduction in its clerical force, announced that the first round of reductions among its

8 non-supervisory clerical employees would occur at the end of the year.  Each branch claims office

9 was told the number of clerical employees that it would be allowed to retain in 2003.  The

10 Vancouver BCO office was initially told it would have to lay off three employees by December

11 31, 2002.  Plaintiff stated that it was maybe two or three weeks after her second conversation

12 with Mr. Mansell about Ms. Reudink that Mr. Mansell announced that clerical layoffs would

13 occur.  Dkt. 21-2, at 29, plaintiff's deposition, at p.134.

14    At the time the planned layoff was announced, there were six non-supervisory clerical

15 employees remaining at the Vancouver branch claims office: Darlene Clock, Cleone Christianson,

16 Patricia Curnes, Andrea Kangas, Ms. Reudink, and plaintiff.

17    Not all of the clerical employees had the same job titles or salary grades, and their job

18 duties differed.  Each job title was given a salary grade.  The salary grades reflected the relative

19 level of responsibilities and duties of the position.   Ms. Christianson, Ms. Reudink, and Ms.

20 Curnes were Claims Associates, with a salary grade of 28.  As Claims Associates, these

21 employees were assigned some claims adjusting functions.  As a Customer Service Clerk, salary

22 grade 25, plaintiff did not have claims-adjusting functions.  Ms. Klock was the Vancouver branch

23 claims office secretary, with a salary grade of 27.  Finally, Ms. Kangas was a Claims Processor

24 with a salary grade of 24.

25    Farmers Insurance Exchange used a matrix to determine which clerical employees would

26 be chosen for layoff.  Fifty percent of an employee's matrix scores was based on performance, as

27 determined by the contribution levels awarded in the employee's last three performance

28

1   evaluations.  Based upon the point values assigned to her contribution levels in 1999, 2000, and
2   2001, plaintiff received a total score of 15 points for the first part of the matrix, the performance
3   portion.  Ms. Kangas and Ms. Curnes received 15 points; Ms. Reudink received 17.5 points; Ms.
4   Christianson received 22.5 points; and Ms. Klock received 25 points.  Plaintiff does not contest
5   the process by which this first part of the matrix was completed, nor does she challenge the result
6   of the scores on this part of the matrix.  Plaintiff's claim of racial discriminated is grounded on the
7   scoring on the second part of the matrix.

8       The other fifty percent of the matrix score was based on an assessment of the employee's
9   current skills in six areas: (1) Dependability and Time Management; (2) Verbal and Written
10  Communication; (3) Claims Systems Skills; (4) Claims Technical Knowledge; (5) Customer
11  Service; and (6) Multi-Tasking.

12      For the second part of the matrix, the current skills assessment, Ms. White rated plaintiff,
13  Ms. Kangas, Ms. Curnes, Ms. Reudink, and Ms. Christianson, the clerical employees she
14  supervised.  Mr. Mansell rated Ms. Klock, whom he supervised.  Mr. Mansell's involvement in
15  assigning the ratings for the second part of the matrix is disputed.

16      On September 30, 2002, Ms. White and Mr. Mansell initially completed the current skills
17  assessments.  Plaintiff's scores on the assessment were in relevant part as follows: (1) a level 2 out
18  of 10 for Dependability and Time Management, noting that plaintiff chose to make and receive
19  personal phone calls instead of assisting her co-workers; (2) a level 2 out of 10 for Verbal and
20  Written Communication, noting that plaintiff rushed through the claims explanation process and
21  failed to give necessary information to the customer; (3) a level 3 out of 10 for Claims Systems
22  Skills, based upon a "fair" knowledge of the systems;  (4) a level 3 out of 10 for Claims Technical
23  Knowledge, noting that plaintiff required the approval or acknowledgment of others when making
24  decisions on claims within her authority or job description; (5) a level 4 out of 10 for Customer
25  Service, noting that, while plaintiff had a very uplifting, friendly personality with all customers,
26  she tended to be disturbing most of the time with a loud voice and personal calls; and (6) a level 4
27  out of 10 for Multi-Tasking, with the comment that plaintiff was not always able to complete the

28

ORDER

1  tasks on her own desk, and was able to cover a few other desks when other clerks were out.  Dkt.

2  39-2, at 7.  None of the critical comments was reflected in plaintiff's prior performance

3  evaluations.

4        At the end of the process, plaintiff had received a final rating of 9 points for this second

5  part of the matrix; Ms. Kangas received 9.5 points; Ms. Curnes received 18 points; Ms. Reudink

6  received 20 points; Ms. Christianson received 22 points; and Ms. Klock received 25.5 points.  Ms.

7  White and Ms. Mansell stated in their declarations that these rankings were consistent with their

8  general impressions of the employees' relative skill sets.  Dkt. 39, at 6; Dkt. 44, at 6.    On

9  October 7, 2002, Ms. White and Mr. Mansell re-did the skills assessments to conform their

10  comments and scores to those listed in the skills matrix that were disseminated by human

11  resources.  When points were assigned based on the skills matrix, all of the point totals increased,

12  with the exception of Ms. Klock's.  At that time, Ms. Nettles received a total of 9.5 points; Ms.

13  Kangas received 10 points; Ms. Curnes received 19 points; Ms. Reudink received 23 points; Ms.

14  Christianson received 24 points; and Ms. Klock received 25 points.

15        Mr. Mansell submitted the completed October 7, 2002 matrix to human resources for

16  review.  Cheryl Sinclair, who was part of the Fail Safe committee tasked with ensuring that the

17  matrix process was applied fairly, reviewed the Vancouver BCO matrix. Ms. Sinclair was

18  concerned that plaintiff's and Ms. Kangas' scores were low, in light of their previous performance

19  evaluations.   Ms. Sinclair thus increased many of plaintiff's and Ms. Kangas' scores.  At the time

20  she changed plaintiff's scores, Ms. Sinclair, who is black, had no knowledge of the complaints

21  that plaintiff had made against Ms. Reudink.  On October 29, 2002, Ms. White formally

22  incorporated those changes into new skills assessments for plaintiff and Ms. Kangas.

23        After Ms. White and Mr. Mansell had completed the matrix process, the Vancouver BCO

24  was informed that it had to lay off two clerical employees during the first round of the layoffs.

25  Under the final matrix, plaintiff and Ms. Kangas had the two lowest matrix scores.  On October

26  31, 2002, plaintiff received a memo titled Workforce Reduction. Dkt. 44-2, at 7.  The notice

27  stated that, "[a]s a result of the decreased work in our office, your position is being eliminated and

28

ORDER

Page - 7

1    the company currently does not have another position to offer you." *Id*.  The memo also stated

2    that "if you are unable to secure another position within the Company, your employment will be

3    terminated at the close of business on December 31, 2002." *Id*.  After plaintiff was notified of

4    her termination, she applied for four positions with Farmers Insurance Exchange and Farmers

5    Insurance Group.  She was not hired for those positions.  Ms. Kangas, who also received the

6    Workforce Reduction memo, requested and received permission to take early retirement, effective

7    February 1, 2003.  Mr. Mansell had known of Ms. Kangas' desire to take early retirement prior to

8    her lay-off notice on October 31, 2002.

9         Twenty out of 71 clerical employees in Farmers Insurance Exchange's Northwest Region

10   were laid off on December 31, 2002; approximately 800 clerical employees were laid off

11   nationwide that year.  Of the 71 clerical employees in the Northwest Region five, including

12   plaintiff, were minorities: three black, one Hispanic, and one Asian (as of October 31, 2002).

13   Dkt. 29, at 4.  Of these five employees, plaintiff was the only one laid off in the December 31,

14   2002 layoff.  Farmers Insurance Exchange has continued to downsize its clerical workforce since

15   the December 2002 layoff.  Since March of 2006, Ms. Klock and Ms. Christianson have been the

16   only two clerical claims employees at the Vancouver branch claims office.

17        On December 2, 2005, Ms. Nettles filed this action *pro se* in Clark County Superior

18   Court, naming Farmers Insurance Company of Washington as the defendant.  The case was

19   removed to federal court on March 28, 2006, and counsel appeared shortly thereafter to

20   prosecute plaintiff's claims.  On June 28, 2006, plaintiff filed an amended complaint in which she

21   substituted Farmers Insurance Exchange and Farmers Group, Inc. as defendants.  In the amended

22   complaint, plaintiff alleged that defendants (1) discriminated against her in employment based

23   upon her race, gender, national origin and age, in violation of 42 U.S.C. § 1981 and RCW

24   49.60.180, and (2) retaliated against her in violation of 42 U.S.C. § 1981 and RCW 49.60.210.

25   Dkt. 5, at 2.

26

27

28

ORDER
Page - 8

1

<u>MOTION FOR SUMMARY JUDGMENT</u>

2       On February 28, 2007, defendants filed a motion for summary judgment, contending that

3  (1) the claims against Farmers Group should be dismissed because Farmers Group was not Ms.

4  Nettles' employer at the time of her termination; (2) the claims under RCW 49.60 are time barred;

5  (3) plaintiff has failed to state an actionable claim of discrimination; (4) plaintiff has failed to state

6  an actionable claim of retaliation; and (5) plaintiff's claim for punitive damages should be

7  dismissed.  Dkt. 20.

8       In her response, plaintiff stated that defendants' motion is well taken with regard to her

9  claims of age and gender discrimination, in light of insufficient evidence to support those claims

10  and that her claim of retaliation based on the failure to hire her after her termination is not

11  supported by sufficient evidence.  Dkt. 56, at 2.  Plaintiff stated in her response that she has

12  abandoned these claims.  Therefore, the remaining claims before the court are allegations of race

13  and national origin discrimination and retaliation in the termination of plaintiff's employment. Dkt.

14  56, at 3.  Plaintiff contends that she has offered a prima facie case of race/national origin

15  discrimination; that she has offered specific and substantial evidence that the reasons given for her

16  poor evaluation and resulting layoff were pretextual; that summary judgment based upon the

17  statute of limitations is not appropriate on plaintiff's state law claims; summary judgment in favor

18  of Farmers Group on the question of whether that entity was plaintiff's employer would be

19  inappropriate because there is a genuine issue of fact as to whether Farmers Group was plaintiff's

20  employer; and plaintiff's claim for punitive damages should proceed.  Dkt. 56.

21       In their reply, defendants maintain that plaintiff has not produced any evidence in support

22  of a claim for discrimination or retaliation based upon her national origin, which is Jamaican; that

23  plaintiff has produced no evidence supporting her claim that she was targeted for layoff because

24  of her race; that plaintiff has produced no evidence of a causal link between her complaints about

25  Ms. Reudink and her selection for layoff; that plaintiff's state law claims are time barred; that

26  plaintiff has neither alleged nor proved a joint employer relationship; and that plaintiff's claims for

27  punitive damages should proceed.  Dkt. 59.

28

ORDER

Page - 9

1

## SUMMARY JUDGMENT STANDARD

2

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories,

3

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

4

to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

5

56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails

6

to make a sufficient showing on an essential element of a claim in the case on which the

7

nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

8

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

9

rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith*

10

*Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant

11

probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e).

12

Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting

13

the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.

14

*Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific*

15

*Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

16

The determination of the existence of a material fact is often a close question.  The court

17

must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

18

e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

19

*Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

20

of the nonmoving party only when the facts specifically attested by that party contradict facts

21

specifically attested by the moving party.  The nonmoving party may not merely state that it will

22

discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

23

to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

24

Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be

25

"presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISCUSSION

**1.  Claims against Farmers Group**

Defendants contend that the claims against Farmers Group should be dismissed because Farmers Insurance Exchange, not Farmers Group, was Ms. Nettles' employer from 1998 through December 31, 2002.  Plaintiff argues that there is a question of fact as to whether plaintiff's employer was Farmers Group, since some of the documents relevant to this case appear to identify Farmers Group as her employer.  Kathryn Trepinski, an Assistant Secretary of Farmers Insurance Exchange, stated in a declaration as follows:

> 3.  FIE is a reciprocal or interinsurance exchange organized and existing under the laws of the State of California (Insurance Code §§ 1280, et seq.).  FIE has its own governing body, rules and regulations, financial statements, and tax identification number.

> 4.  Defendant Farmers Group, Inc. ("FGI"), d/b/a Farmers Underwriters Association, is the attorney-in-fact for FIE.  As attorney-in-fact for FIE. FGI performs certain administrative services for FIE.  FGI does not participate in the handling or processing of insurance claims.

Dkt. 51, at 2-3.

It is unclear from the record what the relationship of the defendants is to one another and to plaintiff. For example, the record contains documents, including plaintiff's termination notice (Dkt. 44-2, at 7), that are on Farmers Group letterhead. There are at least issues of fact as to which of these defendants are responsible for or liable to plaintiff for the alleged acts. Defendants' motion for summary judgment, requesting dismissal of the claims against Farmers Group should be denied without prejudice.

**2. National Origin/Racial Discrimination and Retaliation under 42 U.S.C. § 1981**

Plaintiff claims she was laid off/terminated based upon national origin and racial discrimination, in violation of 42 U.S.C. § 1981.  She also claims defendants retaliated against her after she complained about racial harassment by laying her off, in violation of Section 1981.

1    *National Origin/Racial Discrimination.*  42 U.S.C. § 1981 provides that all persons "shall

2    have the same right ... to make and enforce contracts ... as is enjoyed by white citizens."  In a

3    Section 1981 action, plaintiffs must show intentional discrimination on account of race.  *Evans v.*

4    *McKay*, 869 F.2d 1341, 1344 (9th Cir. 1989). To state a claim under Section 1981, there must be

5    evidence of racial animus on the part of the defendants. *Evans v. McKay*, 869 F.2d 1341, 1345

6    (9th Cir. 1989).  When a plaintiff charges an employer with racial discrimination in taking

7    retaliatory action, a cause of action under 42 U.S.C. § 1981 has been stated.  *Manatt v. Bank of*

8    *America NA*, 399 F.3d 792, 799 (9th Cir. 2003).

9           The burden shifting test of  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

10   (1973), which applies in the Title VII employment context, also applies to employment

11   discrimination claims brought under 42 U.S.C. § 1981.  *Cornwell v. Electra Cent. Credit Union*,

12   439 F.3d 1018, 1028 (9th Cir. 2006). The plaintiff must first establish a *prima facie* case of

13   discrimination consisting of the following elements: (1) plaintiff belongs to a protected class; (2)

14   he or she was performing the job satisfactorily; and (3) he or she suffered an adverse employment

15   action or was treated less favorably than others.  *McDonnell Douglas Corp. v. Green*, 411 U.S.

16   792, 802 (1973). If the plaintiff establishes a *prima facie* case, the burden then shifts to the

17   defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment

18   decisions. *Id.* Once the defendant satisfies this burden, the plaintiff must demonstrate that the

19   employer's alleged reason for the adverse employment decision is a pretext for a discriminatory

20   motive. *Id.* at 804.  A plaintiff may establish pretext either directly, by showing that unlawful

21   discrimination more likely motivated the employer, or indirectly, by showing that the employer's

22   proffered reason is unworthy of belief.  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918

23   (9th Cir. 1996).

24          *Retaliation.*  To establish a retaliation claim under Title VII, "a plaintiff must show (1)

25   involvement in a protected activity, (2) an adverse employment action and (3) a causal link

26   between the two."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (*citing Payne*

27   *v. Norwest Corp.*, 113 F.3d 1079 (9th Cir.1997)).  At that point, the burden of production shifts

28

ORDER

Page - 12

1 to the employer to present legitimate reasons for the adverse employment action. Once the

2 employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to

3 whether the reason advanced by the employer was a pretext. Only then does the case proceed

4 beyond the summary judgment stage. *Id.*

5          Defendants concede that plaintiff can make out a *prima facie* case of race and national

6 origin discrimination because she is black and of Jamaican descent, she met the minimum

7 qualifications for her position as a Claims Customer Service Clerk, she was laid off, and non-black

8 and non-Jamaican clerical employees were retained.  Defendants maintain that they had a

9 legitimate, nondiscriminatory reason for plaintiff's termination when they implemented a company

10 wide reduction in force of clerical employees, based upon a procedure that resulted in the layoff of

11 employees who had the lowest matrix scores, when that procedure which took into account

12 performance and a current skills assessment.  Defendants contend that plaintiff cannot demonstrate

13 that Farmers Insurance Exchange's reason for selecting her was a pretext.

14          Regarding the retaliation claim, defendant maintains that plaintiff first complained about

15 Ms. Reudink in 2001, more than a year before Mr. Mansell or Ms. White did or said anything that

16 she perceived as retaliation; the first part of the matrix score was derived from  past performance

17 reviews that were given long before plaintiff's second conversation with Mr. Mansell; and Ms.

18 Sinclair, who did not know of plaintiff's complaints about Ms. Reudink, determined plaintiff's final

19 matrix score.  Dkt. 20.

20          In her response to the motion for summary judgment, plaintiff contends that her claim for

21 discrimination based upon race and her claim for retaliation were supported by compelling

22 evidence.  She argues as follows:

23          The facts established for purposes of this motion illustrate that the reasons provided for
           Nettles' termination were contrived by her supervisors in the wake of a complaint of racial
24         harassment, were false and unworthy of credence or belief, and constituted a pretext for
           unlawful discrimination and retaliation.  Ms. Nettles had received positive evaluations of
25         her performance at Farmers for calendar years 1998, 1999, 2000, and 2001, which were the
           last four periods that she was regularly evaluated.  In 2001 and 2002, Ms. Nettles
26         complained of racial harassment by a co-worker, Pat Reudink.  Farmers failed to follow its
           own policy when her complaint was not forwarded to Human Resources for investigation.
27         Ms. Nettles was warned in 2002 by the Vancouver Branch Manager, Ed Mansell, that any
           effort to pursue her complaint beyond his office would result in "repercussions" in her

28

ORDER

1   employment.  Later that year, during an evaluative process to determine which clerical
2   employees would be laid off from the Vancouver Branch, Ms. Nettles received the lowest
    scores of any employee evaluated.  She was criticized for deficiencies and conduct that had
3   *never* been noted in previous evaluations.  She was assigned significantly lower scores than
    other employees evaluated in several categories of performance, even though other
4   employees were criticized at least as harshly as Ms. Nettles in the narrative part of the
    evaluation.  The lower numerical scores assigned to Ms. Nettles by her supervisors - which
5   were revised after Human Resources at Farmers even noted that they were inappropriate -
    resulted in her layoff and termination from the company.

6   Dkt. 56, at 3.

7          Regarding plaintiff's claim for discrimination, defendants have shown that lay-offs were

8   part of the company-wide plan to reduce clerical positions, that assigning matrix scores to

9   employees was a legitimate nondiscriminatory process upon which to base the lay-off decision; and

10  that laying off those employees with the lowest matrix scores was a legitimate, nondiscriminatory

11  reason for the terminations. The record shows that plaintiff and Ms. Kangas received the two

12  lowest scores on the skills assessment portion of the matrix; plaintiff and Ms. Kangas were the only

13  two clerical employees who did not receive at least one score of "exceeds expectations" on their

14  2001 performance reviews.  Ms. Curnes, who received a rating of "below expectations" in one of

15  the categories in 1999 raised her ratings in subsequent performance reviews, and received a rating

16  of "exceeds expectations" in one of the categories in 2001.  While plaintiff's matrix scores for lay-

17  off rankings purposes addressed issues that were not raised in performance reviews, nothing in the

18  record shows that the matrix ratings were a pretext for a discriminatory motive.  Even recognizing

19  that the criticisms that resulted in a lower matrix score for plaintiff were not raised in her prior

20  performance evaluations, there is nothing in the record to suggest that the matrix score was a

21  pretext for discriminating against plaintiff *because of her race or national origin.*  Plaintiff has not

22  met her burden to show that the matrix scores Mr. Mansell, Ms. White, and ultimately Ms.

23  Sinclair, assigned to plaintiff, and which ultimately resulted in her termination, were a pretext for

24  discrimination on the basis of race.  Plaintiff's claim based upon national origin and racial

25  discrimination under 42 U.S.C. § 1981 should be dismissed.

26          The retaliation claim is a different issue.  In fact, plaintiff's claim, as argued above in her

27  response to the motion for summary judgment, and as quoted above, is in essence that she was

28

ORDER
Page - 14

1  awarded lower matrix scores as retaliation for having complained that her co-worker was harassing

2  her on the basis of race.  There are outstanding issues of material fact as to whether the matrix

3  score that ultimately led to plaintiff's termination was the result of retaliation for her ongoing

4  complaints about her co-worker's treatment of her, including whether plaintiff communicated to

5  Ms. White and Mr. Mansell that she believed that she was being harassed on the basis of race;

6  whether Mr. Mansell made the statement about repercussions, what he meant by that statement,

7  and what, if any, role that statement had in relation to plaintiff's matrix scores; and whether

8  plaintiff's low matrix scores were the result of retaliation.  Plaintiff has made a sufficient showing

9  of pretext to proceed with the claim of retaliation on the basis of race.  However, plaintiff has not

10  met her burden to raise an issue of fact that she was retaliated against on the basis of her national

11  origin, and this claim should be dismissed.  Defendants' motion for summary judgment should be

12  denied with regard to plaintiff's claim for retaliation on the basis of race, in violation of 42 U.S.C.

13  § 1981.

14      **4.  Claims under the Washington Law Against Discrimination, Chapter 49.60 RCW**

15          Defendants contend that plaintiff's claims under the Washington Law Against

16  Discrimination (WLAD), chapter 49.60 RCW, should be dismissed as time-barred.  Defendants

17  maintain that plaintiff received written notice of her layoff on October 21, 2002, and she did not

18  file this lawsuit until December 2, 2005, beyond the three year limitations for an action under RCW

19  49.60.

20          Plaintiff argues that the October 21, 2002 memo she received told her that her position was

21  being eliminated, not her employment, and that, therefore, the cause of action did not accrue until

22  she was terminated on December 31, 2002.  She contends that this action was timely filed for

23  purposes of the WLAD.

24          The WLAD, RCW 49.60 *et seq*., prohibits discrimination with regard to the right to obtain

25  and hold employment.  RCW 49.60.180*; See* RCW 49.60.030.  WLAD also prohibits employers

26  from retaliating against employees who complain about alleged discrimination.  RCW 49.60.210.

27  While chapter 49.60 RCW does not expressly provide for a particular statute of limitations for

28

1    employment discrimination claims, courts have applied the general three-year statute of limitations

2    in RCW 4.16.080(2) to WLAD claims.  The statute of limitations for actions involving

3    discrimination under RCW 49.60.180 is 3 years. *See Adler v. Fred Lind Manor*, 153Wn.2d 331,

4    355-56, citing *Nearing v. Golden State Foods Corp.,* 114 Wn.2d 817, 820 (1990) (racial

5    discrimination); *Lewis v. Lockheed Shipbuilding & Constr. Co.,* 36 Wn.App. 607, 613 (1984)

6    (disability and/or racial discrimination).  The statute of limitations on a discrimination claim begins

7    to run when the final decision is communicated to the employee, not when the termination

8    becomes effective. *See Delaware State College v. Ricks*, 449 U.S. 250 (1980); *Douchette v. Bethel

9    Sch. Dist. No. 403*, 117 Wn.2d 805, 815-16 (1991);  *Hinman v. Yakima Sch.Dist. No. 7*, 69

10   Wn.App.445, 449-50 (1993).

11          In this case, plaintiff was informed by memo on October 21, 2002 that she would be

12   terminated if she did not find another position in the company.  Dkt. 44-2, at 7.  Plaintiff argues

13   that the memo plaintiff received told her that her position was being eliminated, not that her

14   employment was ending.  That is not the case.  The memo stated that, "if you are unable to secure

15   another position within the Company, your employment will be terminated at the close of business

16   on December 31, 2002." *Id.*  The decision was communicated to plaintiff on October 21, 2002

17   was a final decision, and her causes of action under the WLAD accrued on that date.  The case

18   upon which plaintiff relies, *Stone v. Georgia Power Co.*, 902 F.Supp. 1578 (M.D. Ga. 1995) is

19   factually distinguishable.  The discrimination and retaliations claims under chapter 49.60 RCW

20   should be dismissed as barred by the statute of limitations.

21          **4. Punitive Damages**

22          Plaintiff has requested an award of punitive damages.  Defendant contends that the court

23   should dismiss the claim for punitive damages because plaintiff has presented no evidence of

24   discrimination or that those who participated in the employment actions at issue almost certainly

25   knew that they were engaging in unlawful discrimination and/or retaliation; and because Farmers

26   Insurance Exchange went to great lengths to ensure that its reduction in force was carried out in a

27   nondiscriminatory manner.

28

1      Plaintiff contends that she was retaliated against for complaining about racial harassment by

2 a co-worker, that she was threatened with repercussions if she chose to take her complaint to

3 another level, and that management was aware of harassing conduct and failed to report that

4 conduct to Human Resources.

5      A complaining party may recover punitive damages under 42 U.S.C. § 1981 against a

6 respondent "if the complaining party demonstrates that the respondent engaged in a discriminatory

7 practice or discriminatory practices with malice or with reckless indifference to the federally

8 protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).

9      Defendants contend that punitive damages should not be available in this case because

10 Farmers Insurance Exchange made a good faith effort to carry out the lay-off process in a

11 nondiscriminatory manner, citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999)

12 (employer may have a good faith defense, enabling it to escape punitive damages if it can show

13 that the challenged actions were not taken by senior managers and were contrary to the employer's

14 good faith implementation of an effective anti-discrimination policy).  There are issues of fact that

15 preclude summary judgment at this point on whether punitive damages are available, including the

16 type of authority and the amount of discretion that the decision makers had in what was done.  *See*

17 *Id.* at 543.  There are also outstanding issues of act related to whether defendants acted with

18 malice or with reckless indifference to plaintiff's federally protected rights.  Defendants' motion for

19 summary judgment on the claim for punitive damages should be denied.

20                         **ORDER**

21      Therefore, it is hereby

22      **ORDERED** that Defendant's Motion for Summary Judgment (Dkt.20) is **GRANTED IN**

23 **PART AND DENIED IN PART**, as follows: (1) Plaintiff's claim for racial discrimination under

24 42 U.S.C. § 1981 is **DISMISSED WITH PREJUDICE**; (2) Plaintiff's claim for retaliation on the

25 basis of national origin is **DISMISSED WITH PREJUDICE**; (3) Plaintiff's claim for retaliation

26 on the basis of her complaints about racial harassment/discrimination under 42 U.S.C. § 1981 may

27 proceed; (4) Plaintiff's claims under the Washington Law Against Discrimination, chapter 49.60

28

1 RCW are **DISMISSED WITH PREJUDICE**; (5) Plaintiff's claim for punitive damages may

2 proceed; and (6) plaintiff's claims related to age and gender discrimination, and plaintiff's claims

3 based upon defendants' failure to hire her after her termination have been abandoned and are

4 accordingly **DISMISSED WITH PREJUDICE**.

5       The Clerk of the Court is directed to send uncertified copies of this Order to all counsel of

6 record and to any party appearing *pro se* at said party's last known address.

7       DATED this 26th day of March, 2007.

8

9

10                                  Robert J. Bryan
                                     United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER